Deshawn J. JOHNSON, Petitioner–
Appellant,

v.

James KARNES, Sheriff, Respondent–
Appellee.

No. 98–3099.

United States Court of Appeals,
Sixth Circuit.

Argued April 29, 1999.

Decided Dec. 1, 1999.

Dennis C. Belli (argued and briefed), Columbus, OH, for Petitioner–Appellant.

Steven L. Taylor (argued and briefed), Prosecuting Attorney's Office for the County of Franklin, Columbus, OH, for Respondent–Appellee.

Before: JONES, BOGGS, and COLE, Circuit Judges.

JONES, J., delivered the opinion of the court, in which COLE, J., joined. BOGGS, J. (pp. 597–99), delivered a separate dissenting opinion.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Petitioner-appellant Deshawn Johnson appeals the district court's judgment denying his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Johnson argues that the state trial court's declaration of a mistrial without his consent and in the absence of "manifest necessity," coupled with the State's subsequent decision to retry him, violates the Double Jeopardy Clause of the Fifth Amendment. For the reasons stated herein, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.

### I.

On December 31, 1996, a Franklin County, Ohio grand jury indicted Johnson on the following six counts: aggravated burglary, aggravated robbery, robbery, kidnapping, felonious assault, and having a weapon under disability. The charges in the indictment stemmed from the December 1, 1996 shooting of Stanley Humphrey. According to Humphrey, he met Johnson in the fall of 1996. Over the two month period that followed, he served as a broker or middleman for several drug transactions in which Johnson purchased drugs. According to Humphrey, he and Johnson planned to meet on the evening of December 1, 1996 to discuss "brokering" a drug deal, but Johnson never arrived. Hum-

phrey stated that shortly after he went home, Johnson and an unidentified man arrived at Humphrey's house. Humphrey stated that he and Johnson briefly talked before Johnson pulled out a gun and directed him to enter the house. Johnson and his accomplice checked Humphrey's house for drugs or money, but found neither. Humphrey testified that Johnson, who was still pointing the gun at him, then made him empty his pockets, and took approximately $100 in cash. At some point a struggle between Johnson and Humphrey ensued, and Humphrey was shot in the stomach and chest. Humphrey thereafter called "911," stating that he had been shot by "Shawn," and was thereafter taken to the hospital.

Johnson's first jury trial occurred from July 21 to July 23, 1997 before the Franklin County Court of Common Pleas. Although the judge dismissed the robbery charge at the close of the State's case, he submitted the five remaining counts to the jury. Johnson was acquitted of the aggravated robbery and aggravated burglary charges. However, the jury was unable to reach a verdict on the kidnapping, felonious assault, and weapon charges. Thus, the trial court declared a mistrial on these counts.

Johnson's second state court trial, for the remaining three counts, commenced on October 1, 1997 before the Franklin County Court of Common Pleas. The events of this trial are at issue in this habeas appeal. At trial, the State called Humphrey as its first witness, and Humphrey recounted the events as set forth above. Humphrey's testimony further proceeded as follows:

Q. [prosecuting attorney]: Okay. Tell us what happened.

A. [Humphrey]: We had talked outside. He had turned around. He had asked, you know, can I use your phone. I said yeah. I said I'll bring the phone out. He says, oh, is there somebody there? I said, I don't think so. So he turned around for a minute, turned back

with a pistol, said, do you know what time it is? I knew what time it was.

Q. Explain. When you say you knew what time it was, explain.

A. I knew it was a robbery. You know, I knew I was going to get robbed. Reason how I know I was going to get robbed, couple days before that—

[Prosecuting attorney]: May we approach?

Thereupon, Court and counsel confer at the bench out of the hearing of the jury off the record:

Q. [By prosecuting attorney] I want to stay on what happened that day. That's why I cut you off.

A. Okay. Somebody pull a gun out on you, you know what time it is. You know you're going to get robbed. I had nothing.

J.A. at 119.[1]

On cross-examination, defense counsel questioned Humphrey as follows:

Now, sir, you described an aggravated burglary, somebody going in your house and pulling out drawers, looking around for goods. You described somebody pointing a gun at you saying they were going to rob you. Sir, isn't it true that a jury found my client not guilty of robbing you?

J.A. at 146. At that point, the prosecuting attorney objected, and the judge asked counsel to approach the bench. The conference between the judge and counsel proceeded as follows:

The Court: Under what circumstances could you possibly believe that you can inquire into that?

[Defense counsel]: Mr. Stead [the prosecuting attorney] brought out about [Humphrey] being robbed, about a burglary taking place and I think this jury should have a complete picture of this.

---

**1.** Defense counsel did not object to Humphrey's aggravated robbery testimony.

The Court: Now, some judges might do something really serious about that question.

[Defense Counsel]: Judge, I think it's appropriate ... [t]his jury should have the complete picture of this thing.

[Prosecuting Attorney]: Judge, can we hear this conversation-can we go to the back? This is important.

The Court: Do you want a mistrial? I'll grant it if you want a mistrial.

[Defense Counsel]: I'm going to object to a mistrial.

The Court: You can object all you want. I don't know how it's going to cost you.

[Prosecuting Attorney]: I don't want to ask until I talk to my appellate people.

The Court: You make a decision right now. Do you want a mistrial right now?

[Prosecuting Attorney]: I am concerned about jeopardy ramifications.

The Court: You have your choice right now. If you want a mistrial, ask for it now. If not, I'll instruct the jury how far you want me to instruct the jury. I'm not going to wait to talk to appellate people.

[Prosecuting Attorney]: Judge, this is an absolutely crucial issue and for a five minute delay—

The Court: Five-minute delay? I'll give you five minutes.

J.A. at 146–48.

The common pleas judge thereafter allowed a brief recess (approximately ten or fifteen minutes) to allow the prosecuting attorney to confer with his office. The judge, defense counsel and the prosecuting attorney thereafter held a sidebar conference. The judge directed defense counsel to state, for the record, his reasons for questioning Humphrey about Johnson's previous robbery acquittal. The record

reveals that this sidebar conference consisted primarily of defense counsel doing just that-explaining why he believed that the question he posed to Humphrey was appropriate. Specifically, defense counsel argued that the testimony the prosecutor elicited from Humphrey about a robbery was impermissible and warranted clarification on cross-examination and that the jury should not have been allowed to consider evidence regarding prior "bad acts" allegedly committed by Johnson. In response, however, the judge stated that he believed that the question was impermissible and that the situation could not be cured. The judge then addressed the prosecutor as follows: "I told you I would give you the option if you wanted a mistrial. I don't think it's a curable situation. If you want a mistrial, I'll grant it." J.A. at 155. The prosecutor responded as follows:

> Your Honor, I went downstairs and did confer. It is my opinion that manifest necessity makes me ask for a mistrial. I have never asked for one in fourteen years. I regret asking for one in this case. You can't unring that bell. I would never feel a not guilty verdict was a fair result in this case. I'm asking to start over.

*Id.* The prosecutor provided no additional support for his argument that manifest necessity compelled a mistrial.

On November 5, 1997, Johnson filed a motion to dismiss the remaining three counts (kidnapping, felonious assault, having a weapon while under disability) on double jeopardy grounds. The common pleas judge denied the motion[2] and Johnson thereafter filed his habeas petition. The district court denied the petition, finding that "manifest necessity" existed for the mistrial. This timely appeal followed.

---

**2.** Under Ohio law, a trial court's judgment denying a defendant's motion to dismiss on double jeopardy grounds is not a final appealable order. *State v. Crago,* 53 Ohio St.3d 243, 559 N.E.2d 1353, 1355 (Ohio 1990). Where double jeopardy claims "have been raised and rejected in the state trial court and under state law there is no right to interlocutory appeal ... federal adjudication was necessary to protect petitioner's rights under the Double Jeopardy Clause." *Harpster v. Ohio,* 128 F.3d 322, 325–26 (6th Cir.1997).

## II.

██ On appeal, we consider whether the Double Jeopardy Clause prohibits the State of Ohio from retrying Johnson on the remaining counts-kidnapping, felonious assault, and having a weapon while under a disability. In conducting our inquiry, we review the district court's decision to deny Johnson's § 2254 petition *de novo*. *See Harpster*, 128 F.3d at 326. However, we review the state trial court's decision to grant a mistrial pursuant to the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See id.* The AEDPA provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(West Supp.1999). As we explained in *Harpster*, the question of manifest necessity is a mixed question of law and fact. *Harpster*, 128 F.3d at 327. Thus, we "must decide whether the state court grant of a mistrial 'involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court.'" *Id.* (alteration in original; quoting 28 U.S.C. § 2254(d)(1)). For the reasons that follow, we conclude that the state trial court's decision to grant a mistrial was, in fact, an "unreasonable application" of the Supreme Court's "manifest necessity" standards.

## III.

██ On appeal, Johnson contends that the state trial court erred in granting the mistrial, and that therefore, the State's subsequent decision to re-prosecute him violates the Double Jeopardy Clause. Conversely, the State asserts that because the state trial court properly declared a mistrial due to manifest necessity, there was no double jeopardy violation.[3]

██ The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const. amend. V; *see also Arizona v.*

---

**3.** We note that the parties also disagree as to the admissibility of evidence of a prior acquittal under Ohio state law. Johnson argues that evidence of his prior burglary acquittal is admissible under Ohio law since the prosecutor elicited testimony from Humphrey regarding the alleged conduct. The State contends that reference to the prior acquittal was inadmissible hearsay evidence and inadmissible under Rule 403 because it was unfairly prejudicial, confused the issues, and would have misled the jury. A determination of the admissibility of this evidence is not within the purview of this court in conducting habeas review. As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), an inquiry as to whether evidence was properly admitted or improperly excluded under state law "is no part of a federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to reexamine state-

court determinations on state-law questions." *Id.* at 67–68, 112 S.Ct. 475. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treatises of the United States." *Id.* at 68, 112 S.Ct. 475. Furthermore, in denying defendant's later motion to dismiss the indictment, the state trial court relied on *Ohio v. Swanson*, No. 89AP–199, 1989 WL 99410 (Franklin Cy. Ct. App. Aug. 29, 1989). Although *Swanson* is an unpublished decision, we are bound by this decision unless we are convinced that the Ohio Supreme Court would decide the acquittal issue differently. *See Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir.1988). Johnson has failed to establish that *Swanson* was erroneous, or that the Ohio Supreme Court would decide the issue differently. Accordingly, we confine our analysis to the double jeopardy issue.

*Washington,* 434 U.S. 497, 503–05, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The Clause applies to the States via the Fourteenth Amendment. *See Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Accordingly, "[o]nce jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empaneled and sworn alternates, is barred unless (1) there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents to a mistrial." *Watkins v. Kassulke,* 90 F.3d 138, 141 (6th Cir. 1996); *see also United States v. Larry,* 536 F.2d 1149,1153 (6th Cir.1976)("If a mistrial had been improperly declared appellant's retrial would have been violative of his Fifth Amendment right not to be subjected to double jeopardy."). Here, Johnson neither requested nor consented to the mistrial. Thus, the mistrial was properly granted only if there was a "manifest necessity" for the mistrial.

The Supreme Court first enunciated the "manifest necessity" doctrine in *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). The Court held that a judge may declare a mistrial and discharge a jury when "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.* at 580. Recognizing the significance of declaring a mistrial, the Supreme Court stated that a trial judge should declare a mistrial based on manifest necessity "with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Perez,* 22 U.S. at 580. Although the Supreme Court has refined the doctrine over the years, this emphasis on caution has remained since *Perez.* For example, in *Washington,* · the Supreme Court further elaborated on the "manifest necessity" standard and noted that the standard cannot "be applied mechanically or without attention to the particular problem confronting the trial judge. . . . '[N]ecessity' cannot be interpreted literally; instead . . . we assume that there are degrees of ne-

cessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Washington,* 434 U.S. at 506, 98 S.Ct. 824. In addition, the Supreme Court has made clear that "in passing on the propriety of a declaration of mistrial granted at the behest of the prosecutor or on the court's own motion," the reviewing court must "balanc[e] 'the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him . . .' against the public interest in insuring that justice is meted out to offenders." *United States v. Scott,* 437 U.S. 82, 92, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978)(quoting *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)).

 In balancing these significant interests, reviewing courts must also afford considerable deference to the trial court's determination that manifest necessity warranted a mistrial. *See Washington,* 434 U.S. at 511, 98 S.Ct. 824 ("[T]he overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment."). Despite this considerable deference to the state trial court's decision, the Supreme Court has strongly emphasized the need to protect the defendant's significant constitutional interests:

> [A] constitutionally protected interest is inevitably affected by any mistrial decision. The trial judge, therefore, must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate. In order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised "sound dis-

cretion" in declaring a mistrial. Thus, if a trial judge acts irrationally or irresponsibly ..., his action cannot be condoned.

*Id.* at 514, 98 S.Ct. 824 (internal quotations and citations omitted); *see also Perez,* 22 U.S. at 580. In conducting our analysis as to whether a mistrial was properly declared in the case *sub judice,* we are mindful that "any question of the propriety of the exercise of judicial discretion is a factual matter which can only be determined on a case by case basis dependent upon the individual circumstances under review." *Larry,* 536 F.2d at 1153. Indeed, the Supreme Court has determined that "the guiding principles of [ ] *Perez* ... command courts ... to take all circumstances into account and thereby forbid the mechanical application of an abstract formula." *Wade v. Hunter,* 336 U.S. 684, 691, 69 S.Ct. 834, 93 L.Ed. 974 (1949)(internal quotations omitted).

■ Based on these standards, we conclude that the state trial court did not exercise its "sound discretion" in declaring that a mistrial was manifestly necessary. *See Larry,* 536 F.2d at 1153 ("The sole limitation on the authority of the court to determine that a mistrial is 'manifestly necessary' is that the judge must exercise his 'sound discretion' in determining that the ends of public justice would not be served by a continuation of the proceedings.")(citing *U.S. v. Jorn,* 400 U.S. 470, 481, 91 S.Ct. 547, 27 L.Ed.2d 543; *Gori v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *Perez,* 22 U.S. at 580). In *Glover v. McMackin,* 950 F.2d 1236 (6th Cir.1991), we discussed the type of analysis a trial court must undertake in deciding whether manifest necessity warrants a mistrial. In describing the *Washington* trial court's decision to grant the mistrial, we noted that the *Washington* state trial court "explicitly noted the serious considerations attendant upon a mistrial order, and consciously proceeded in a cautious fashion so as to avoid or minimize their consequences. After subsequent re-

search and argument on the matter, the judge ultimately granted the mistrial." *Id.* at 1241. We further explained the following:

> It is that degree of careful consideration and solicitude for the serious consequences attendant upon mistrials that is required for a court to shoulder its *Perez* burden of "sound discretion." We recognize that a trial court is not constitutionally required to make an explicit finding of "manifest necessity," nor to establish on the record the full extent of its carefully considered basis for the mistrial. The exercise of discretion stands on much firmer ground, however, when it is apparent on the face of the record the reasons for a particular decision, and the analytic process leading to that conclusion.

*Id.* (internal citation omitted). After considering the standards set forth in *Perez* and *Washington,* and reviewing the record, we concluded that there was " neither manifest necessity nor sound discretion" and noted that "[t]he mistrial was declared shortly into the cross examination of the victim." *Id.*

Such is the case here. Indeed, the state trial judge in Johnson's case pressured the prosecutor to make the decision at that very moment and only allowed a very brief recess before listening to counsel's arguments regarding the mistrial. Further, the trial court's failure seriously to consider alternatives to declaring a mistrial further militates against a finding that manifest necessity warranted a mistrial. *See id.* at 1242 ("Other mechanisms are available to protect the witness and control the courtroom, including granting a recess or continuance, or threatening or imposing contempt sanctions. At least some effort of this sort is required before we can find the sort of necessity needed to meet the *Perez* standard. This is particularly true where the trial court seems not to have considered these alternatives, or weighed their consequences against the vital concerns of not being twice placed in jeopar-

dy."); *see also Harpster*, 128 F.3d at 330 (noting that "a simple corrective instruction would have sufficiently protected against juror bias").

In those cases in which we have found that the trial judge exercised "sound discretion" in finding that manifest necessity compelled a mistrial, the trial judge engaged in "careful consideration and solicitude for the serious consequences attendant upon mistrials...." *Glover*, 950 F.2d at 1241; *see also Washington*, 434 U.S. at 515–16, 98 S.Ct. 824 (noting that "the trial judge did not act precipitately," but rather, "evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial"); *United States v. Gantley*, 172 F.3d 422, 425, 428–29 (6th Cir.1999)(per curiam)(finding a mistrial warranted where defendant "impliedly consented" to a mistrial and defendant, while testifying on cross-examination, stated that the prosecutor knew he was "telling the truth, because [the prosecutor] saw the polygraph test [he] took in the past"); *United States v. Simpson*, 1991 WL 1333, at *5, 922 F.2d 842 (6th Cir.1991)(finding that the trial judge exercised sound discretion in declaring the mistrial where the trial judge "held an extensive hearing on the effects and repercussions of the evidentiary errors" and "took a night to deliberate over the question of whether a mistrial was necessary").

■ The care taken by the state trial judge here falls well below that exercised in the aforementioned cases. The judge made his decision after granting only a short recess and listening to brief arguments by both parties, with the majority of the argument consisting of defense counsel explaining why he believed the question was proper. The State failed to articulate why manifest necessity required a mistrial. We further find it significant that the trial court judge failed to consider less drastic alternatives, but instead immediately de-

cided that a mistrial was appropriate. We also express considerable concern regarding the state trial judge's remarks during the hearing at which he denied Johnson's motion to dismiss on double jeopardy grounds. According to the trial judge, "[m]anifest necessity requires the trial judge [to] penalize the side who violates the rules and start the search for the truth all over again." J.A. at 77. The trial judge's suggestion that "manifest necessity" is a judicial tool to "penalize" the perceived wrongdoer further reflects that court's misunderstanding of the manifest necessity standard and the import of a mistrial declaration. Accordingly, we believe that the trial judge failed to act rationally, responsibly or deliberately, and thus failed to exercise sound discretion as required by *Perez* and its progeny. *See Washington*, ("[I]f a trial judge acts irrationally or irresponsibly, his action cannot be condoned.")(internal citations omitted). The following conclusion in *Harpster* applies with equal force to the case *sub judice*:

> Although the decision of a trial court to declare a mistrial based on potential juror bias is entitled to special respect, it would be an unreasonable application of the law, as established by Supreme Court precedent, to conclude that manifest necessity existed for a mistrial in this case.... [A] simple corrective instruction would have sufficiently protected against juror bias. Because this case lacks the urgent circumstances or high degree of necessity required to justify a mistrial, double jeopardy bars the retrial of petitioner.

*Harpster*, 128 F.3d at 330.

We find that this case also lacked such "urgent circumstances" as are required to justify a mistrial. For example, defense counsel explained that he believed that he had a legitimate basis on which to ask the question. Further, Humphrey had not answered the question at the time the prosecutor objected. Moreover, the prosecutor merely objected to the question; he did

not initially request a mistrial and he further expressed double jeopardy concerns once the trial judge intimated that he was inclined to declare a mistrial. Thus, we conclude that manifest necessity did not warrant a mistrial.

## IV.

For the aforementioned reasons, we find that the state trial court failed to exercise "sound discretion" in declaring a mistrial. While we afford considerable deference to the trial judge's conclusion that the jury would have been prejudiced by defense counsel's question, we believe that clearly established Supreme Court precedent demonstrates that the declaration of a mistrial was not compelled by manifest necessity. Because we conclude that the state court's declaration of a mistrial constituted unreasonable application of the manifest necessity standard enunciated by the Supreme Court, the judgment of the district court is **REVERSED,** and the case is **REMANDED** with instructions to issue the writ of habeas corpus.

BOGGS, Circuit Judge, dissenting.

This case involves a defense attorney who by his questioning introduced impermissible material into a criminal trial. In so doing, he set up a "triple bind" in which his client would potentially benefit (or at least not suffer) no matter the outcome. The court's opinion today agrees that the material was impermissible as a matter of state law, and that its exclusion would not offend any federal constitutional provisions. Nonetheless, the court's opinion clangs shut the trap set by the defense attorney, and allows the defendant to go free. In my opinion, this result is contrary to established law, and I respectfully dissent.

### I

As the opinion well sets out in its facts section, the underlying events arose out of what is alleged to be a drug deal gone bad.

The alleged victim was forced at gun point to enter his house, and some cash was taken from his person before a struggle ensued culminating in a shooting.

At a first trial, the defendant was acquitted of "aggravated robbery" and "aggravated burglary" but the jury hung with respect to kidnapping, assault, and weapons charges. As with all criminal acquittals, the reason for the acquittals does not appear on the record. It could have related to elements included in the definition of "aggravated," though that is by no means certain.

At the second trial, the prosecuting attorney simply asked the victim to describe what happened. He did so, and in the course of his explanation used the terms " robbed" and "robbery." In the cross-examination, the defense attorney (apparently without foundation) began by saying, "You described an *aggravated* burglary," (emphasis added) though the victim did not use that term. He then stated: (and introduced an inference into the jury's mind) "Isn't it true that a jury found my client not guilty of robbing you?"

At this point, there were three possible results of the impermissible introduction of this information:

1. The jury would be favorably influenced in the defendant's behalf.

2. A mistrial would be declared and the client would be no worse off, as there was no indication in this particular case that the current jury or trial was particularly favorable to the defendant.

3. A mistrial would be declared and a subsequent appellate court would find that it should not have been declared.

As a result of today's opinion, the attorney's tactics (intentional or not) were brilliant. Future defense attorneys will no doubt pay close attention.

### II

As the court's opinion fairly sets forth, the judge's initial comments may be characterized as vigorous, if not intemperate.

However, after the recess, and after the prosecutor decided that he wished a mistrial (again, an error in judgment as it has turned out) the judge heard argument by both sides. There is no indication that he cut off the defense attorney's argument. On this record, I simply cannot agree that the trial judge acted "irrationally or irresponsibly" in the words of *Arizona v. Washington*, 434 U.S. 497, 514, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). Rather, as was the case in *Washington*, the judge ultimately "gave both defense counsel and the prosecutor full opportunity to explain their positions...." *Id.* at 515–16, 98 S.Ct. 824.

While the record could conceivably support the court's harsh and direct statement that the trial judge "failed to act rationally, responsibly or deliberately" (slip op. at 596–97) at some moments in the events, I do not think that a reading of the record as a whole can support that assessment as to his ultimate ruling. In particular, the focus on the judge's statement that the mistrial would "penalize the side who violates the rules" and his failure to expound on the record about double jeopardy consequences seems to me to create a "magic words" standard. The prosecutor's legitimate (and again, quite prescient) anguishing over the possible view taken by an appellate court years later, and his specific invocation of the classic argument by those asking for a mistrial based on introduction of impermissible evidence (defense or prosecution) that "you can't unring that bell" demonstrate to me that the issue was not overlooked.

Finally, the court's citation, at page 596, of Glover's invocation of the threat or use of contempt sanctions rings increasingly hollow after cases such as *Hanner v. O'Farrell*, 1998 WL 136212, 142 F.3d 434 (6th Cir.1998), where this court overturned contempt sanctions lodged against considerably more egregious behavior.

### III

The primary cases from this circuit cited to support this outcome are quite distinguishable.

In *Harpster*, our court's decision was primarily based on the holding that the defense actions that allegedly justified the mistrial were either not erroneous at all, in one case, or, in another, resulted in an "amount of prejudice that could have existed, if any existed at all, [that] was minuscule." *See Harpster v. Ohio*, 128 F.3d 322, 330 (6th Cir.1997). The portion of *Harpster* cited at page 596 for the proposition that a "simple corrective instruction" would have been adequate is in the context of this minuscule or nonexistent prejudice.

In *Glover*, the judge declared a mistrial without any motion or argument, in the midst of a heated cross-examination in which numerous objections had been made, some sustained and some overruled. After an additional question, an objection was made, stating simply that counsel "is trying to badger the witness." Defense counsel retorted "I'm not badgering anybody," and the judge immediately declared: "Gentlemen, this is a mistrial." *See Glover v. McMackin*, 950 F.2d 1236, 1238 (6th Cir.1991).

With due respect to the court's interpretation of the events at bar, the judge's actions in *Glover* were a far cry from what happened in this case, where argument was permitted, and the judge did not make a final ruling until after a motion had been made.

Rather, I would analogize this case more closely to *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). In the *Washington* case, the Supreme Court (overturning the judgments of both the district court and the court of appeals) upheld a mistrial granted because of comments by the defense attorney in opening statement that introduced impermissible material. It did so even though the trial court did not even make an explicit finding of "manifest necessity" and did not, in the view of some, explain the decision adequately. The court specifically stated that "[s]ince the record provides sufficient jus-

tification for the state-court ruling, the failure to explain that ruling more completely does not render it constitutionally defective." *Washington,* 434 U.S. at 516–17, 98 S.Ct. 824.

## IV

Thus, I would hold that no error occurred, much less the kind of "unreasonable application of ... clearly established federal law, as determined by the Supreme Court of the United States" that would be necessary to set this defendant free. *See* 28 U.S.C. § 2254(d)(1). I would affirm the judgment of the district court and therefore respectfully dissent.